No. 58,468

STATE OF KANSAS, *Appellee*, v. ROBERT W. ARMSTRONG, *Appellant*.

(731 P.2d 249)

Opinion filed January 16, 1987.

*John E. Cowles*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause and was on the brief for the appellant.

*Geary N. Gorup*, assistant district attorney, argued the cause, and *Robert T. Stephan*, attorney general, and *Clark V. Owens*, district attorney, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: The defendant, Robert W. Armstrong, directly appeals his convictions by a Sedgwick County jury of two counts of first-degree murder for the murders of Don and Norma Earl. This was defendant's third jury trial. The first trial ended in a mistrial due to a hung jury. The second trial ended in a mistrial when the trial judge ruled that the defendant was not mentally competent to proceed.

On Saturday, June 2, 1979, Don and Norma Earl made plans to get a drink at the Copacabana, a tavern owned by Cecil Stembridge. Later that evening, Norma Earl called her babysitter and said she and her husband were playing pool at Leroy Willcox's house and would be home in one hour. The Earls were never seen by their family again.

Prior to his death, Don Earl was being investigated by the FBI for involvement in a stolen money order and counterfeit check operation. When questioned by the FBI, Don Earl said the defendant, an employee of NCR, had allowed Don to run checks at NCR. The FBI then questioned the defendant, without telling

him Don Earl had informed on him, and the defendant denied any involvement.

Over four years later, in October of 1983, Cecil Stembridge was arrested in Texas on a kidnapping charge which originated in Kansas. At that time, Stembridge was questioned about the disappearance of Don and Norma Earl. After talking with his daughter, Tammy Stembridge, Cecil requested information on the federal witness protection program and agreed to talk about the Earls' disappearance in exchange for a grant of immunity. After showing police where the bodies were located, Cecil Stembridge was granted immunity and was the prosecution's key witness against the defendant.

Stembridge directed officers of the Sedgwick County Sheriff's Department to the grave site located in rural Kingman County, Kansas. The bodies were buried wrapped in yellow shower curtains and found in regular street clothes. The bodies were exhumed and autopsies performed.

Cecil Stembridge stated Don Earl told him in June of 1979 that Don thought people, including the defendant, were after him (Don) because they thought he had snitched on them regarding a check-writing scheme. Cecil stated Don and Norma Earl arrived at the Copacabana some time during the afternoon of June 2, 1979. While at the Copacabana, Cecil spoke with Leroy Willcox, who invited Cecil, Cecil's brother and wife, and the Earls to his home to shoot pool and drink. They proceeded to Willcox's house, where they played pool and had drinks in the basement. When the defendant arrived, Cecil stated Don Earl became quiet. Cecil walked his brother and wife to the door and upon returning to the basement, found Willcox grabbing Don Earl around the waist. A jumper cable was wrapped around Don's neck. Willcox and the defendant strangled Don Earl, each pulling on one end of the cable. Norma Earl, who had observed all of this, stated she wanted to go home. Willcox and the defendant then took the cable off Don and wrapped it around Norma's neck, strangling her. During the struggle, Norma scratched Willcox. Willcox then got some scissors and cut off her fingernails. After having some drinks upstairs, the three men (the defendant, Willcox, and Stembridge) then drove to a department store and bought two yellow shower curtains. They wrapped the bodies in shower curtains, waited until dark, and then loaded them in the

trunk of Willcox's car. They drove to the country, where they dug a single hole and buried the Earls together. When they returned to town, they drove Don Earl's car to an apartment complex, where they left it.

The defendant, charged and convicted of two counts of first-degree murder, filed this appeal. Willcox, who was also charged with two counts of first-degree murder, was tried separately and, on his fourth trial, was acquitted of two counts of second-degree murder.

First, the defendant argues the trial court erred in denying the defendant's motion for a new trial on the basis of newly discovered evidence. Following the defendant's conviction, the final trial of Leroy Willcox commenced. Charles O'Hara, one of the defendant's court-appointed attorneys at his third trial, represented Willcox. During trial preparation for the Willcox trial, Assistant District Attorney Greg Waller turned over all his files to Mr. O'Hara. In these files, Mr. O'Hara discovered a memorandum from Major Leo Willey to Assistant District Attorney Waller. Also, as Mr. O'Hara prepared for the testimony of FBI Agent Robert K. Jobe, he discovered Agent Jobe's field notes. These two items, the memorandum and the field notes, are the basis for the defendant's motion for a new trial due to newly discovered evidence.

The memorandum dated January 5, 1984, from Major Willey to Assistant District Attorney Waller, concerns Tammy Stembridge. The memo stated that in December of 1983, after Cecil Stembridge had been granted immunity, Major Willey's office was contacted by an attorney looking for Tammy. The attorney, who represented the natural father of Tammy's child, explained Tammy had apparently contacted the natural father and grandparents to arrange a transfer of custody of her child to the natural father. Tammy then failed to appear in court for the adoption proceeding. At that time, Tammy was staying with her father in protective custody. When Tammy's case was rescheduled, one of the guards assigned to protect Cecil Stembridge transported Tammy to court. Then, in the middle of December, Tammy, who was no longer staying with her father, came to Major Willey's office and said what she thought had been a temporary custody situation for her child had turned out to be a permanent adoption. Tammy said she wasn't sure she was interested in the

witness protection plan if she could not have her child. She asked Major Willey to look into the situation. Major Willey sent an officer to talk to the probate judge, who refused to give information to the officer but stated if Tammy had an attorney he would talk to the attorney. Major Willey then contacted an attorney, Stuart Gribble, and asked him, as a personal favor, to talk to the judge hearing the adoption proceeding. It was arranged for Tammy to talk to Mr. Gribble, who then talked to the judge. The judge stated he had explained to Tammy it was a permanent adoption and that she should have an attorney, yet, Tammy insisted on going through with the adoption. Mr. Gribble relayed this information to Major Willey and to Tammy. Several days later, Tammy complained to Major Willey concerning the lack of action taken by his office. He explained that he did not feel his office had any legal obligation to attempt to regain custody of her child for her, that she was not the protective witness, and that his office had done what she had requested. When Willey talked to Cecil Stembridge a few days later, Stembridge stated he realized the sheriff's department had no responsibility in the adoption matter. In conclusion, the memo stated:

"That's the last I heard about the situation until the day that we had the meeting with JOHN CLEVELAND, the Inspector from the Federal Marshal's Office, and JACK WILLIAMS, the Deputy United States Attorney, and GREG WALLER, the Assistant District Attorney for Sedgwick County, myself, CECIL STEMBRIDGE, his son PHILIP, and his daughter TAMMY, at which time TAMMY brought it up again. I am reducing this information to writing for MR. JOHN CLEVELAND of the Federal Marshal's Office and I am sending a copy of it to MR. GREG WALLER, the Assistant District Attorney.

"It is not for general publication and I do not intend for it to be given to anyone else. And my personal opinion is that it has no bearing whatsoever on the criminal prosecutions that MR. CECIL STEMBRIDGE is a witness in. And it is strictly a family matter of his daughter's who is a legal adult in the State of Kansas, TAMMY STEMBRIDGE."

Agent Jobe's field notes concerned the Mother's Day ring, which was one item used to identify the body of Norma Earl. At trial, the defendant argued strongly the bodies found were not those of the Earls. Although Dr. Eckert did not remember seeing a ring on the body's finger at the gravesite, one was present at the autopsy. Cecil Stembridge testified Leroy Willcox took the ring off Norma and kept it. Detective Thompson identified the ring, with three colored stones of yellow, green, and red, as the ring

recovered along with the female victim. At trial, Rhonda Jackson, Norma Earl's daughter, identified the ring with the three stones of yellow, red, and green as belonging to her mother. Agent Jobe's field notes concern an earlier statement made by Rhonda Jackson describing the stones as red, blue, and blue. The handwritten notes state the following:

"Rhonda Jackson . . . Ring bought her on a Mother's Day [about] 5-6 [years] ago after her real Dad died. [Bought about] '76. Silver. (3) birthstones. Garnet her's [sic] is ruby red. Jodi [light] blue (pale). Rick " [ditto marks indicating stone was also light blue]. All 3 stones in a row."

The rules relative to the granting of new trials on the basis of newly discovered evidence pursuant to K.S.A. 22-3501 were summarized in *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984), as follows:

" ' "The granting of a new trial for newly discovered evidence is in the trial court's discretion. (*State v. Larkin*, 212 Kan. 158, 510 P.2d 123, *cert. den.* 414 U.S. 848, 38 L. Ed. 2d 95, 94 S. Ct. 134.) A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. (*State v. Hale*, 206 Kan. 521, 479 P.2d 902.) The credibility of the evidence offered in support of the motion is for the trial court's consideration. (*State v. Anderson*, 211 Kan. 148, 505 P.2d 691; *State v. Larkin*, [212 Kan. 158].) The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. (*State v. Lora*, 213 Kan. 184, 515 P.2d 1086; *State v. Arney*, 218 Kan. 369, 544 P.2d 334.) The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. (*State v. Campbell*, 207 Kan. 152, 483 P.2d 495; *State v. Anderson*, [211 Kan. 148].)" ' "

In *State v. Kelly*, 216 Kan. 31, 531 P.2d 60 (1975), prior inconsistent statements made by the prosecution's key witness were the basis for a new trial. Assuming the evidence was withheld by the prosecutor, the court applied a two-part test to determine if a new trial was warranted: first, whether the evidence was exculpatory and, second, whether the evidence was so material to the outcome of the case that its withholding would be clearly prejudicial. Regarding the first test, it was stated:

"It has generally been held that evidence is exculpatory if it tends to disprove a fact in issue which is material to guilt or punishment. (*Brady v. Maryland*, [373 U.S. 83, 10 L.Ed. 2d 215, 83 S. Ct. 1194 (1963).]) However, this rule was somewhat expanded in *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763, to include evidence bearing upon the credibility of a key witness on an important issue in the case. In *Giglio* it was held that credibility may be a material issue when the prosecution's case rests almost entirely upon the testi-

mony of that witness. In such a case the reliability of the testimony of the witness may well be a determining factor by which the jury arrives at guilt or punishment. For this reason evidence materially affecting credibility may fall under the heading of exculpatory evidence." 216 Kan. at 36-37.

It was found the evidence in issue "might rise to the level of exculpatory evidence" but a different result would not have been reached. The key witness' credibility had been impeached at trial both by the prosecutor and the defendant. Therefore, the defendant was only deprived of the opportunity to recall the witness in order to further confront him with his prior inconsistent statements.

In its ruling on the defendant's motion for a new trial, the trial court stated the memorandum and the field notes went to the credibility of certain witnesses and, although the field notes were withheld due to inadvertence, the memo was intentionally withheld by the State and was material to the issue of the defendant's guilt or innocence. The trial court then determined that a different result would not have resulted had the jury known of these two pieces of evidence:

"The matter for determination at this point is whether or not the new evidence discovered would have resulted in a different verdict being returned had the jury known of such evidence (*State vs. Larkin*, 212 Kan. 158, 510 P.2d 123 [1973]; *State vs. Ashworth*, 231 Kan. 623, 647 P.2d 1281 [1982]; *State vs. Richard*, 235 Kan. 355, 681 P.2d 612 [1984]).

"At his fourth trial, Mr. Armstrong represented himself with lawyers assigned to assist upon request of Mr. Armstrong. Mr. Armstrong directed his lawyers not to explore by way of cross examination certain areas that went to the credibility of the accomplice witness. In particular, Mr. Armstrong would not allow the lawyers to cross examine the accomplice as to money paid by the State to the witness for his support and upkeep.

"The questioned evidence then becomes something that could have been used by the defendant had he known about it *and chose to use it at trial*. It cannot be said that a different result would have been obtained." (Emphasis added.)

The defendant argues the trial court improperly speculated on whether the defendant would have used this evidence to impeach these witnesses. We disagree. In ruling on a motion for new trial based upon newly discovered evidence, the trial court must engage in a certain degree of speculation when determining whether the evidence is of such materiality that it would be *likely* to produce a different result on retrial. The trial court was not speculating whether the defendant would use the evidence, but whether, if the evidence was used upon retrial, a different verdict would result.

Our review is limited to determining whether the trial court abused its discretion in denying the defendant's motion, and we find it did not. The trial court had heard the evidence of this case on three separate occasions. It saw and heard the witnesses and had a better opportunity to know whether a different verdict would have resulted on retrial. *State v. Lackey*, 72 Kan. 95, 99, 82 Pac. 527 (1905). The memorandum would have been offered to impeach the credibility of Cecil Stembridge. The jury clearly chose to believe Cecil Stembridge when it convicted the defendant of two counts of first-degree murder. This was after the defendant had impeached Cecil Stembridge with his prior inconsistent statements and alleged "concessions" made to his son, Philip Stembridge, by the State's dismissal of criminal charges brought against Philip. We do not believe a different result would have occurred by confronting Cecil with the alleged "concessions" made to his daughter Tammy.

The field notes would be offered merely to impeach the credibility of Rhonda Jackson, who was not a key witness in the case, as having made a prior inconsistent statement. This evidence would not likely have produced a different result. Furthermore, it is a long-established rule that a new trial is not granted on the basis of newly discovered evidence which merely tends to impeach or discredit the testimony of a witness. *State v. Hobson*, 237 Kan. 64, 66, 697 P.2d 1274 (1985); *State v. Richard*, 235 Kan. at 363; *State v. Foy*, 224 Kan. 558, 569, 582 P.2d 281 (1978); *Davis v. State*, 210 Kan. 709, 715-16, 504 P.2d 617 (1972); *State v. Watson*, 204 Kan. 681, 685, 466 P.2d 296 (1970); *State v. Wolf*, 7 Kan. App. 2d 398, 405, 643 P.2d 1101, *rev. denied* 231 Kan. 802 (1982). The trial court did not err in denying the defendant's motion for a new trial.

Next, the defendant argues his conviction should be reversed and he should be granted a new trial because his waiver of the right to counsel was not knowingly and intelligently made. The defendant argues his waiver needs to be made with an apprehension of the nature of the charges, their punishment, and their defenses; that he needs to be informed that he will be held to the same standard as an attorney, that the judge will not aid him, and that it is advisable to have a lawyer.

After the defendant's second trial ended in a mistrial, one of

the defendant's court-appointed counsel moved to withdraw upon the defendant's request. The defendant at that time indicated he wanted to represent himself. District Court Judge Ray Hodge advised the defendant he was losing a valuable asset and allowed defendant's court-appointed counsel to withdraw. Judge Hodge granted the defendant's request to appear pro se and appointed two attorneys to aid the defendant at his third trial.

Although Judge Hodge did not warn the defendant of the pitfalls of self-representation at the time of accepting the defendant's waiver of his right to counsel, Judge Paul Clark, the trial judge at defendant's third trial, did warn the defendant. After the jury was selected, but before the presentation of evidence, Judge Clark told the defendant the quote attributed to Abraham Lincoln that the lawyer who represents himself has a fool for a client. Judge Clark told defendant of Clarence Darrow, a great criminal lawyer who hired an attorney to represent him rather than representing himself. Judge Clark also explained to the defendant that he must follow the rules of evidence. Judge Clark then asked the defendant what he thought about representing himself and the defendant stated he knew the facts, and his attorneys knew the law, and if they did not question a witness the way the defendant wanted, then the defendant would question the witness.

In *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975), the United States Supreme Court recognized there is a constitutional right to self-representation. See *State v. Ames*, 222 Kan. 88, 563 P.2d 1034 (1977). A waiver of one's Sixth Amendment right to counsel must be voluntary and must be a knowing and intelligent relinquishment or abandonment of a known right or privilege. Whether a waiver is made knowingly and intelligently depends upon the particular facts and circumstances surrounding each case, including the accused's background, experience and conduct. *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981). The crucial question is not the defendant's legal background, but "whether he has properly been made aware of the dangers and disadvantages of self-representation—so that the record will establish that he understands what he is doing and has made his choice with his eyes open." *State v. Cunningham*, 222 Kan. 704, 706, 567 P.2d 879 (1977).

Under circumstances similar to the instant case, this court has found the defendant voluntarily and intelligently waived his right to counsel in *State v. Williams*, 226 Kan. 82, 87, 595 P.2d 1104 (1979). There, the trial judge established the following:

"The trial judge established by his inquiry that Williams wanted to try his own case; that he knew very little about a trial; no rules of evidence; nothing about voir dire; nothing about the elements of the crime; that the court wouldn't help him; that he needed a lawyer; that he knew the range of punishment in case of conviction."

It was ruled the trial court had adequately advised the defendant of the dangers of self-representation for the defendant to voluntarily and intelligently waive his right to counsel.

In *United States v. Romero*, 640 F.2d 1014 (9th Cir. 1981), the defendant was advised of his right to counsel and a public defender was appointed to represent him. The defendant, however, decided he wanted to represent himself and the trial judge advised him self-representation would be extremely unwise. The federal circuit court ruled the defendant knowingly and intelligently waived the assistance of counsel.

In *Fillipini v. Ristaino*, 585 F.2d 1163 (1st Cir. 1978), the circuit court of appeals held that, in determining whether to accept an accused's waiver of his right to counsel, the district court can consider the defendant's background, experience, conduct, involvement in a previous criminal trial, and his representation by counsel before trial. There, the defendant had refused appointed counsel many times, stating he was going to retain an attorney. The defendant, however, was unable to get his own attorney and signed a waiver of his right to counsel. In determining the defendant had failed to show by a preponderance of the evidence his waiver was not made with knowledge and understanding, the appellate court considered the fact that the defendant had been charged and convicted before on an unrelated charge and a previous trial on the current charge had ended in a mistrial.

Here, we find the defendant voluntarily and intelligently waived his right to counsel. As this was the defendant's third trial, he knew the nature of the charges, the penalties, and any defenses. He was represented by a public defender at his first trial and, at his second trial, he was represented by two court-appointed attorneys. At the defendant's third trial, he was not strictly held to his waiver of counsel, but was allowed a hybrid

representation in which court-appointed counsel argued certain motions for the defendant, examined certain witnesses, and argued the jury instructions in closing argument. Judge Clark, who warned the defendant prior to trial that it was not wise to represent himself and that he would be bound by the rules of evidence, was also the trial judge at the defendant's first trial. Under these circumstances, we find the defendant had his eyes "wide open" when he waived his right to counsel.

The defendant also argues his conviction must be reversed and a new trial granted for failure to satisfy K.S.A. 22-3426(a), which requires a journal entry of judgment to include "a statement that the defendant was duly represented by counsel naming such counsel, or a statement that the defendant has stated in writing that he or she did not want counsel to represent him or her." In the instant case, the journal entry of judgment states only that "[t]he defendant appears in person, *pro se*" with his court-appointed advisors.

The issue of satisfying the requirements of K.S.A. 22-3426(a) was recently raised in *State v. Turner*, 239 Kan. 360, 367-68, 721 P.2d 255 (1986). There, the defendant entered his plea of guilty pro se. On appeal, he argued noncompliance with K.S.A. 22-3426(a) required his guilty plea be set aside. In the opinion, Justice Prager reviewed case law involving K.S.A. 62-1516 (Corrick), the predecessor to K.S.A. 22-3426(a):

"In *Selbe v. Hudspeth*, 175 Kan. 154, 157, 259 P.2d 204 (1953), the court stated that the purpose of K.S.A. 62-1304 (Corrick), a similar statue, was to provide for a record that disclosed fully what had occurred, so that there could be no controversy as to what advice was given to the accused by the court and his responses and answers to any questions asked him or as to whether the trial court made the findings requisite under the statute.

"In *Goetz v. Hand*, 185 Kan. [788,] 793, [347 P.2d 349 (1959),] this court stated that the *judgment record* is prima facie evidence of the facts which it recites. Where a question of waiver of the right to counsel arises, the Kansas decisions simply hold that there must be some written evidence in the record to show that the defendant was fully advised as to his right to appointed counsel." 239 Kan. at 367.

This court found the requirements of K.S.A. 22-3426(a) were satisfied because the journal entry covering the defendant's first appearance in district court stated, without equivocation, that the court had informed the defendant of his right to counsel and that if the defendant was unable to afford counsel, counsel would be appointed to represent him.

Here, the trial transcript, viewed as written evidence, establishes the defendant knowingly and voluntarily waived his right to counsel. The question then becomes how to correct the journal entry.

In *State v. Andrews*, 5 Kan. App. 2d 678, 623 P.2d 534 (1981), the Court of Appeals stated that where a journal entry is "merely incomplete and subject to correction to reflect the truth of what has in fact occurred, the judgment may be affirmed upon an entry *nunc pro tunc.*" 5 Kan. App. 2d at 681. The record in *Andrews* was completely silent on the issues of whether the court had advised the defendant of his right to counsel and whether it had inquired into the defendant's request to waive that right. The trial record stated only that the defendant "is appearing personally, acting in his own defense, having waived his right to counsel." The Court of Appeals ruled a nunc pro tunc order could not be used to correct the incomplete journal entry in *Andrews* because the trial record did not support such a correction.

Here, the record does support such a correction. The journal entry is merely incomplete and can be corrected by a nunc pro tunc order. Such a correction has been allowed in cases involving K.S.A. 62-1516 (Corrick). *Browning v. Hand,* 184 Kan. 365, 366, 336 P.2d 409 (1959), *cert. denied* 361 U.S. 926 (1960) (journal entry which failed to contain recital of details of the defendant's former convictions as required by G.S. 1949, 62-1516 subject to correction); *Jamison v. Hudspeth*, 168 Kan. 565, 567-68, 213 P.2d 972 (1950) (failure of journal entry to state statute under which defendant's sentence was imposed, as required by 62-1516, subject to correction); and *Wilson v. Hudspeth*, 165 Kan. 666, 668-69, 198 P.2d 165 (1948), *cert. denied* 335 U.S. 909, *reh. denied* 336 U.S. 911 (1949) (journal entry's failure to state section of statute under which verdict was rendered and sentence imposed subject to correction). Where, as in the instant case, the record supports a finding that the defendant knowingly and voluntarily waived his right to counsel, an incomplete journal entry may be corrected by way of a nunc pro tunc order.

Next, the defendant argues he was denied a fair trial by the intentional destruction and negligent loss of material evidence by the State—a set of dentures and fibers from the victims' clothing.

At the time the bodies were first exhumed from their common grave, a set of dentures was removed with the male body. However, at the time of trial, the dentures had inexplicably disappeared. The defendant argues this made it impossible for him to demonstrate that the remains were not those of the Earls, but belonged to another couple with whose disappearance Cecil Stembridge was connected.

At the time of the autopsy, Dr. Eckert, the coroner, removed the clothing from the bodies and hand washed them in bleach and detergent before any fibers could be removed from the clothing to be analyzed. This caused problems when comparing fibers from the clothes with carpet fibers found in Willcox's basement.

The defendant relies on *State v. Wright*, 87 Wash. 2d 783, 557 P.2d 1 (1976), to support his argument that his convictions must be reversed and charges dismissed. There, the clothing from a woman's body, found in a decomposing condition, was removed from the body and destroyed because the police did not have adequate facilities to store it. Furthermore, all evidence found in the room where the body was discovered was also destroyed. It appears that no analysis of any kind was performed on the evidence prior to its destruction. The defendant, the victim's husband, whose conviction of first-degree murder was based entirely on circumstantial evidence, enumerated on appeal nine ways the evidence could have assisted him; for example, another man's coat found in the room could have been analyzed for blood, and the blood on the victim's clothing could have been tested to show it was dissimilar to the defendant's blood type. As a sanction against the State for failing to insure the defendant a fair trial by preserving evidence, the court reversed the defendant's conviction and dismissed the proceedings.

The instant case is distinguishable from *State v. Wright*, 87 Wash. 2d 783. Here, the defendant was not convicted entirely on circumstantial evidence but, rather, on the testimony of an eyewitness to the crime. Furthermore, the evidence in issue here was analyzed. Dr. Eckert testified the final identification of the male body was based on dental records, those of Don Earl, sent from Leavenworth. Dr. Eckert testified this identification was made by the sheriff's department detectives. When the defendant questioned the whereabouts of the dentures during the

presentation of his case, it was learned the dentures were buried with the bodies after completion of the investigation and that during a subsequent exhumation of the bodies, the dentures appeared to still be in the body bags. The State explained a videotape of the exhumation existed which could confirm whether the dentures were present at the exhumation and suggested another exhumation take place. The defendant stated he wanted the trial to proceed, that it was unnecessary to exhume the bodies to find the dentures, and that he was satisfied with the evidence given as to what had happened to the dentures.

Regarding the fibers, both the defendant and the State had experts who testified concerning the effect the bleaching done by Dr. Eckert had on the evidence. Andrew Podolak, a special agent with the FBI, testified for the State that the bleach didn't make any difference on the generic composition of the fibers. He felt the loss of color from the clothing fibers resulted more from the decomposition of the bodies, which produces a tremendous amount of heat, rather than from the bleaching. In comparing the clothing fibers and carpet fibers, he concluded the fibers on the clothing could have come from the carpet in Willcox's basement. Patrick Glynn, a forensic scientist testifying for the defendant, compared only the colors of the clothing fibers and the carpet fibers and found they didn't match.

In *California v. Trombetta*, 467 U.S. 479, 488-89, 81 L. Ed. 2d 413, 104 S. Ct. 2528 (1984), involving the presentation of breath samples in a DUI case, the United States Supreme Court stated the following:

"Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs*, 427 U.S. at 109-110, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Under the facts presented, we find the standards set forth above are not satisfied and defendant was not denied a fair trial.

Finally, the defendant argues the trial court erred when it failed to instruct the jury on the lesser included offense of second-degree murder. The defendant did not request an instruction on second-degree murder and, in fact, the defendant had his court-appointed attorneys tear up a request for instruc-

tions on lesser included offenses that they had prepared at the close of the evidence.

First, the State argues the defendant waived the issue of lesser included offense instructions when the defendant failed to request those instructions.

K.S.A. 21-3107(3) explicitly places the duty of instructing the jury on lesser included offenses on the trial court, regardless of whether requests or objections were made by the parties. *State v. Marks,* 226 Kan. 704, 713, 602 P.2d 1344 (1979); *State v. Johnson,* 220 Kan. 720, 723, 556 P.2d 168 (1976); *State v. Clark,* 214 Kan. 293, 297, 521 P.2d 298 (1974); *State v. Weyer,* 210 Kan. 721, 727, 504 P.2d 178 (1972); *State v. Fouts,* 169 Kan. 686, 692, 221 P.2d 841 (1950). The duty of the trial court to instruct on lesser included homicide offenses is applicable only when the evidence introduced during trial is such that the defendant might reasonably have been convicted of the lesser offense. *State v. Pearson,* 234 Kan. 906, 918, 678 P.2d 605 (1984); *State v. Hutton,* 232 Kan. 545, 554, 657 P.2d 567 (1983); *State v. Sullivan & Sullivan,* 224 Kan. 110, 120, 578 P.2d 1108 (1978); *State v. McCorgary,* 218 Kan. 358, 365, 543 P.2d 952 (1975), *cert. denied* 429 U.S. 867 (1976). The evidence supporting the lesser crime, however, need not be overwhelming. The accused has the right to have his theory of the case presented to the jury under appropriate instructions where there is support in the evidence even though the evidence may be weak and inconclusive. *State v. Seelke,* 221 Kan. 672, 676, 561 P.2d 869 (1977). If the evidence at trial excludes a theory of guilt on the lesser offense, the failure to instruct the jury on some lesser degree of the crime charged is not grounds for reversal. *State v. Sullivan & Sullivan,* 224 Kan. at 120. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser included offense, but whether there is any substantial evidence tending to prove that lesser included offense. If there is, then the question of such degree should be submitted to the jury. *State v. Clark,* 214 Kan. at 299; *State v. Buffington,* 66 Kan. 706, 72 Pac. 213 (1903).

There is no question second-degree murder is a lesser included offense of first-degree murder. All of the elements of second-degree murder are included in the elements of first-degree murder, which contains the additional element of premedi-

tation. *State v. Arney,* 218 Kan. 369, 375, 544 P.2d 334 (1975). The defendant argues there was no evidence of premeditation to support the first-degree murder charge and, therefore, the trial court should have instructed the jury on second-degree murder. The defendant also gives the example of Willcox's experience to show the error of not instructing on second-degree murder. At his third trial, Leroy Willcox, who was charged with first-degree premeditated murder and tried separately, was convicted of two counts of second-degree murder just months before the defendant's trial. The State argues the evidence doesn't support an instruction on second-degree murder, as the defendant's defense was that of nonparticipation in the crime and that the bodies found in the graves were not those of Don and Norma Earl.

In order for the evidence to be sufficient to require instructions on lesser included offenses, testimony supporting such instructions must be offered either by the State or by the defense for the purpose of proving what events occurred at the time the homicide was committed. Contradictory statements of a witness offered only to destroy credibility and not as positive evidence to prove the matters contained in the statements are not alone sufficient to require an instruction on the lesser degrees of homicide. *State v. Marks,* 226 Kan. at 714.

Here, the defendant did not testify. The only witness who testified concerning how the deaths of the Earls occurred was Cecil Stembridge. Cecil Stembridge testified that at the time of the murders the only people present were Stembridge, Leroy Willcox, and the defendant. On direct examination, Stembridge stated the defendant and Leroy Willcox strangled both Don and Norma Earl with the use of jumper cables. On cross-examination, Stembridge indicated that no one had planned anything. The primary goal of the defense in this case was to challenge the credibility of Cecil Stembridge, and on this approach the defendant failed. If the defendant himself had testified that nobody had planned anything, that unsupported testimony standing alone would be sufficient to require the court to instruct on the lesser offense of second-degree murder. *State v. Buffington,* 66 Kan. at 710.

The entire thrust of the defense in this case as presented to the jury by the defendant was that he did not participate in the crimes and that the bodies found in the graves were not those of

Don and Norma Earl. We find that, under all the evidence presented in this case, the trial court did not err in its failure to instruct on second-degree murder.

The judgment of the lower court is affirmed. The State is directed to correct the journal entry by procuring an order nunc pro tunc.

Approved by the court prior to the retirement of Schroeder, C.J.

ALLEGRUCCI, J., not participating.