No. 65,035

STATE OF KANSAS, *Appellee*, v. MARK HUPP, *Appellant.*

(809 P.2d 1207)

Opinion filed April 15, 1991.

*Steven R. Zinn*, deputy appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David B. Debenham*, assistant district attorney, argued the cause, and *Gene M. Olander*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by defendant Mark Hupp from his conviction by a jury of first-degree murder based upon a killing committed in the perpetration of the abuse of a child, K.S.A. 1989 Supp. 21-3401(c).

Hupp contends that the trial court erred in failing to instruct the jury on lesser included offenses and that K.S.A. 21-3609 is unconstitutionally vague in that it does not reasonably convey a sufficient warning as to the conduct which is proscribed.

Michael Cloud was three and one-half months old when he died of a severe blow to his head. Michael was born on June 9, 1989, to Debbie Tenbrink. When Debbie was eight months pregnant, she started dating Mark Hupp. Mark and Debbie were married on June 30, 1989.

Mark was 21 years old at the time of Michael's death. Mark had been a hyperactive child. At the age of 10 or 11, Mark was removed from his home by SRS and placed in a group home.

He was then admitted to the Topeka State Hospital for about two years and then transferred to the Parsons State Hospital until he was 18.

On July 8, 1989, Michael was admitted to Stormont-Vail Regional Medical Center because of several unexplained bruises on his left shoulder and upper back and the left side of his neck. Mark initially told a social worker at the hospital that he was unable to explain how the bruises occurred, but later Mark said he supposed that Michael got pinched between the frame of the waterbed and the mattress where he and Michael had been sleeping the previous night. The social worker reported her suspicions of child abuse to the SRS.

Debbie testified that on July 7, 1989, she, Mark, and Michael had spent the night at Mark's mother's house. Michael woke up at 1:30 a.m. and was placed next to Mark on the bed. At approximately 3 a.m., Michael woke up crying again. Debbie testified she fixed Michael a bottle, returned, and gave it to Mark, who started feeding Michael. Debbie then noticed the bruises on Michael. She testified she had no idea how they occurred.

The doctor who examined Michael at the hospital for these bruises was of the opinion that the bruises were not accidental.

Michael spent several days in the hospital and was then placed in a foster home by SRS.

Dustin Koelliker, a friend of Debbie's, who had lived with the Hupps at several different time periods, testified at trial that Debbie gave him inconsistent explanations for the bruises and why Michael was in SRS custody. He testified that at one point when Mark was present, she told him that Michael was injured in a car accident. He testified that Debbie later told him, while Mark was not present, that she had been in the room with Mark and Michael, had left, and returned to find Mark shaking the baby. Koelliker also testified that he had seen Mark "tap" Michael on his bottom too hard.

A number of people at the hospital testified that Mark's behavior with the baby was inappropriate. Laurie O'Shea-Parsons, a social worker at the hospital, observed that Mark kept asking nurses, "When can we make him go to sleep?" and "Why is he crying?" Several nurses saw Mark repeatedly try to make Michael take the pacifier when he was already asleep. He would pat the

sleeping baby hard enough to wake him up. The nurses had to tell him to leave the baby alone. When personnel were trying to draw blood from Michael, Mark yelled at Michael for crying.

When Michael was in the hospital on another occasion, one nurse saw Mark try to hold Michael's head down in order to force him to go to sleep.

The Hupps were referred for psychological testing. The psychologist testified that when Mark came into his office, he picked up the padded arm which had broken off of a chair and said that it looked like "something that he could discipline his kids with."

A resident in the Hupps' apartment complex testified that he would hear a baby crying in the Hupps' apartment, and then he would hear Mark telling the baby to shut up.

Michael died on September 28, 1989. Debbie testified that on the night of September 27, 1989, Michael slept in his crib in the bedroom. She testified that she and Mark stayed up all night playing cards and Nintendo. She testified that at 6:30 a.m., Mark went to rent videotapes. She testified that when he returned, they both watched one tape, and she watched half of another while Mark went to bed.

Debbie testified that she started to go to bed and stopped to check Michael's heart monitor and noticed that it had gone off and was on "slow heart." (Michael suffered from sleep apnea.) Debbie testified that Michael was okay, but that the alarm went off and Mark woke up. She testified she asked Mark if she should fix Michael a bottle and that she then went into the kitchen to do so. She testified that she heated the bottle by running it under hot water, so it took ten to fifteen minutes.

Debbie testified that while fixing the bottle, she did not hear any noises from the bedroom until Mark yelled her name and she returned to the bedroom. She testified that Mark told her he had picked up Michael from the crib and that he was wiggling around and had fallen to the floor. Debbie testified that something was obviously wrong with Michael, that there was a knot on the right side of his head that was growing larger. She testified that she saw Michael was not crying and that when she spoke to him he did not look up at her.

Debbie testified that because they did not have a phone, Mark ran to a nearby phone to call an ambulance while she fixed an ice pack.

An off-duty paramedic heard the call and was first to arrive. He testified Debbie was in the corner crying and that Mark repeated his story about dropping Michael. The paramedic said Michael's condition was critical—that he was suffering from some form of a central nervous system dysfunction or a head injury. He noted a large hematoma on Michael's head.

When Michael arrived at the hospital, he was in critical condition. His blood pressure kept dropping and he stopped breathing. A C.T. scan showed a depressed skull fracture. The physicians operated immediately to elevate the bone and take the pressure off of Michael's brain. Michael was in a coma by the time the operation started, and suffered cardiac arrest repeatedly during the two-hour operation. Michael died soon after.

One of the physicians who treated Michael, Dr. Poulton, had intensively studied injuries to children resulting from abuse. He testified that the injury to Michael could not have occurred in the manner in which Mark claimed. The floor at the Hupps' apartment was concrete and covered with padding and carpeting. Poulton testified that an infant's skull is extremely flexible, and that a fall from three to four feet onto such a soft floor could not cause such an injury. He testified that a severe blow is required to fracture an infant's skull.

The autopsy showed multiple fractures (severely depressed) to the skull and subdural hemorrhaging, including hemorrhaging at the back of the brain on both sides. The membrane covering the brain was torn loose on both sides. A piece of skull bone was broken away and attached only by a membrane. The pathologist who conducted the autopsy testified to the same points as had Dr. Poulton: that an infant's skull is pliable; that it would take a strong blow to cause this type of injury rather than a fall of a few feet; and that, from the nature of the wound and the absence of cuts to the skin, he felt that the most likely weapon was a fist.

Mark testified that he had never hit Michael. He testified that Michael started wiggling and he dropped him.

Following Michael's death, a social worker at the hospital told Mark that there would be an autopsy. Mark responded, "That means first degree murder. I didn't mean to do it."

A resident at the Hupps' apartment complex testified that after the death she spoke to Debbie, who told her that Mark did not mean to do it, but that he just got tired of Michael's crying and fussing all the time.

A friend of Debbie's, Linda Graham, testified that after Michael's death, Debbie told her that the night before Michael died she had been carrying Michael and had slipped and fallen, and Michael had hit his head on a doorknob. Graham testified, however, that Debbie's stories about the incident varied and "just all kind of run together and changed every time you heard it."

At trial, Debbie was asked about this incident. She testified that the incident did occur, but that she did not tell anyone about it until after Michael died.

Mark was charged with first-degree murder in connection with child abuse (contrary to K.S.A. 1989 Supp. 21-3401[c]). The statute includes, as a definition of first-degree murder, "the killing of a human being committed . . . in the perpetration of abuse of a child, as provided in K.S.A. 21-3609 and amendments thereto." K.S.A. 1989 Supp. 21-3401(c).

The jury was instructed on first-degree murder in connection with child abuse. The defense argued for an instruction on involuntary manslaughter, based on two underlying grounds. The trial court held that all evidence tending to negate first-degree murder, if believed, would show that the defendant was not guilty, rather than guilty of a lesser included offense. The trial court also found the evidence of the underlying felony of child abuse was strong rather than weak.

On appeal, the defense argues that the trial court should have instructed the jury on involuntary manslaughter, based on three different underlying theories. The defense argues that the judge should have instructed the jury on involuntary manslaughter based on "endangering a child in a wanton manner" (K.S.A. 21-3608), or involuntary manslaughter based on a "lawful act of disciplining a child committed in a wanton manner." These two grounds were argued at trial. On appeal, the defense also argues for involuntary manslaughter based on simple battery.

A trial court does have the duty to instruct on lesser included crimes. K.S.A. 21-3107(3) provides:

"In cases where the crime charged may include some lesser crime, it is the duty of the trial court to instruct the jury, not only as to the crime charged but as to all lesser crimes of which the accused might be found guilty under the information . . . and upon the evidence adduced. If the defendant objects to the giving of the instructions, the defendant shall be considered to have waived objection to any error in the failure to give them, and the failure shall not be a basis for reversal of the case on appeal."

Although the defense did not request instructions on involuntary manslaughter based on battery, a court is under an affirmative duty to give an instruction on a lesser included offense, if warranted by the evidence, even if a defendant fails to request it (and so long as he does not object to it). See K.S.A. 21-3707; *State v. Cummings,* 242 Kan. 84, 91, 744 P.2d 858 (1987). This court will consider the battery argument even though it was not raised at trial in this case.

Involuntary manslaughter is a lesser included offense of murder. *State v. Gregory,* 218 Kan. 180, 181-83, 542 P.2d 1051 (1975). Normally, the test of whether an instruction on a lesser included offense is required is whether there is any substantial evidence tending to prove that lesser included offense. *State v. Armstrong,* 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 926 (1987). A corollary to this rule is that "an instruction on an included offense is not proper if from the evidence the jury could not reasonably convict of the lesser offense." *Gregory,* 218 Kan. at 183. In reviewing the evidence to determine whether a lesser included offense instruction should have been given, this court must review the evidence in a light most favorable to the defendant. *State v. Hill,* 242 Kan. 68, 74, 744 P.2d 1228 (1987).

When the primary crime is felony murder, however, this court has used a stricter analysis. A trial court is only under a duty to instruct on a lesser included offense of felony murder when the evidence of the underlying felony is weak or inconclusive. *State v. Sullivan & Sullivan,* 224 Kan. 110, 121, 578 P.2d 1108 (1978). This court has explained that the reason for the rule was said to be "that the killer's malignant purpose is established by proof of the collateral felony." *State v. Wilson,* 220 Kan. 341, Syl. ¶ 2,

552 P.2d 931 (1976), *overruled on other grounds* 226 Kan. 308, 597 P.2d 1108 (1979).

We first must determine whether to apply this rule to first-degree murder by abuse of a child. This court previously held that felony murder could not be based on child abuse because of the merger rule. *State v. Prouse*, 244 Kan. 292, 767 P.2d 1308 (1989); *State v. Lucas*, 243 Kan. 462, 759 P.2d 90 (1988), *aff'd on reh.* 244 Kan. 193, 767 P.2d 1308 (1989). The legislature then amended the first-degree murder statute to make a killing committed in perpetration of abuse of a child to be first-degree murder.

In *Lucas*, the legislature was invited by a majority of this court to adopt a felony-murder statute covering the death of a child occurring during the commission of child abuse. This court said: "If additional protection for children is desired, the Kansas Legislature might well consider legislation which would make the death of a child occurring during the commission of the crime of abuse of a child, or aggravated battery against a child, first- or second-degree *felony murder.*" *State v. Lucas*, 243 Kan. at 473. (Emphasis supplied.)

The legislature responded by amending the first-degree murder statute twice. We now have two first-degree murder statutes (K.S.A. 1990 Supp. 21-3401 and K.S.A. 1990 Supp. 21-3401a). The statutes are considerably different in other respects, but for the issues raised in this case, the salient parts are similar. Hupp was charged with violating K.S.A. 1989 Supp. 21-3401 (now K.S.A. 1990 Supp. 21-3401). The pertinent part of -3401 defines first-degree murder as "the killing of a human being committed: . . . (b) in the perpetration of or attempt to perpetrate any felony, or (c) in the perpetration of abuse of a child, as provided in K.S.A. 21-3609 and amendments thereto."

When the legislature adopted child abuse murder as first-degree murder, it did so using the same language of felony murder as set forth in the same statute. The legislature intended felony murder and the rules concerning lesser included offenses in felony-murder cases to apply to child abuse murder.

In felony murder, premeditation and intent are transferred from the underlying felony; thus, the need for instructions on lesser

included child abuse murder should be analyzed in the same manner as for other felony murder.

The analysis of whether the jury should have been instructed on lesser included offenses includes two steps. The first step in analyzing this issue is to determine whether the evidence of child abuse was so strong that no instruction on lesser included offenses was necessary. If the evidence of the underlying felony was strong, no instruction on the lesser included offenses need have been given. Then, if the evidence was not strong, this court would consider whether there was evidence on which a jury could have found the defendant guilty of the lesser included offenses. If there was not, no instruction on lesser included offenses need have been given.

The evidence in this case was entirely circumstantial; no one testified to actually seeing Mark hit Michael. The fact that the evidence was circumstantial, however, should not be determinative, as a conviction based on circumstantial evidence is permissible. In *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990), this court said:

"A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Smith*, 245 Kan. 381, 393, 781 P.2d 666 (1989). When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Smith*, 245 Kan. at 392."

Child abuse is defined by K.S.A. 21-3609 as "willfully torturing, cruelly beating or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years."

The circumstantial evidence here shows that Debbie left a healthy baby in a crib. When Michael called out and she returned, the baby had a head injury that proved to be fatal. There is also a great deal of evidence to show that, in the past, Mark got angry and responded inappropriately when Michael cried; *e.g.*, he yelled at him when nurses were drawing blood and witnesses heard Mark yelling at him while he was crying in the apartment. Further, there is evidence that Mark spanked Michael, although Michael was less than four months old. Additionally, there were statements made by Mark which, according

to how one interprets them, are incriminating: "That means first degree murder. I didn't mean to do it."

There is also evidence to the contrary. First, Mark testified that he did not strike the baby. Second, Debbie testified that, at some point prior to this, she had slipped while holding Michael, and he had hit his head on a doorknob. However, Debbie's statements about the doorknob were suspiciously ambiguous and contradictory. She told a friend different versions of the same story.

The evidence only presents the jury with two choices: either Mark hit Michael with such force as to crush his skull and kill him or there was an accident—Mark dropped Michael or Debbie hit Michael's head on a doorknob when she slipped.

Child abuse includes a cruel beating or infliction of cruel and inhuman corporal punishment. K.S.A. 21-3609. In *State v. Danforth*, 125 Wis. 2d 293, 371 N.W.2d 411 (Wis. App. 1985), *aff'd* 129 Wis. 2d 187, 385 N.W.2d 125 (1986), the Wisconsin Court of Appeals considered whether intent to injure is an element of the Wisconsin child abuse statute. The court held that the word "cruel" does not establish malice as an element and that the section does not contain an element of intent to injure; it only requires an intent to do the act which caused injury. 125 Wis. 2d at 295.

An intent to injure is not implicit in "cruelly beating or inflicting cruel and inhuman corporal punishment." It is the act of hitting and hurting that is made a crime.

The fact that Mark may have only intended to stop Michael from crying is irrelevant. Child abuse does not require more than one blow. A blow that crushes an infant's skull and kills the child is, as a matter of law, a "cruel beating."

If Mark hit Michael and crushed his skill, then the proper charge is felony murder by child abuse.

As to the proposed lesser included offenses, in battery, the only requirement is that a defendant intentionally touch or apply force and that it be done in a rude, insolent, or angry manner. Assuming, without deciding, that battery is a lesser included offense of child abuse, and, assuming involuntary manslaughter based on battery is a lesser included offense of first-degree child abuse murder, because the evidence here shows that Mark either

cruelly beat Michael or he did not hit him at all, no instruction on the potential lesser included offense of involuntary manslaughter based on battery was required.

Hupp argues that in 1944 this court, in *State v. Severns*, 158 Kan. 453, 148 P.2d 488 (1944), reversed a murder conviction of a man who beat a child to death for the trial court's failure to give an instruction on involuntary manslaughter in the first degree under the theory that the defendant might have committed an unlawful act of misdemeanor battery in a wanton manner.

As we read *State v. Severns*, it first holds that the felony-murder instruction given was erroneous because it instructed the jury " '[m]urder at the common law is also the unlawful killing of a human being committed in the perpetration of an [*sic*] attempt to perpetrate *any crime or misdemeanor nor amounting to a felony* ' " (emphasis supplied) (158 Kan. at 456), and because the jury was instructed on first-degree premeditated murder. The jury was also instructed on second-degree murder and manslaughter in the second, third, and fourth degrees, but not on first-degree manslaughter.

At that time, G.S. 1935, 21-407 defined manslaughter in the first degree as:

"The killing of a human being without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony, in cases when such killing would be murder at the common law, shall be deemed manslaughter in the first degree."

Under this statute, when manslaughter was charged, an explanation of common-law murder was necessary. The instruction on common-law murder, however, made no sense when manslaughter was not charged. The court held that the felony-murder instruction was erroneous because it allowed a conviction when the underlying crime was a misdemeanor. The court also held that, under the facts, a first-degree manslaughter instruction should have been given.

In 1944, mistreatment of a child was a misdemeanor and there was no felony-murder statute covering the death of a child occurring during abuse of a child, contrary to K.S.A. 21-3609. A jury could have concluded that the killing was unintentional, in

which case the greatest crime proven would have been manslaughter based on child abuse. Because child abuse is now a felony, *State v. Severns* does not serve as precedent to find error.

The same is true of any lesser included offense of involuntary manslaughter based on the lawful act of discipline done in an unlawful or wanton manner. Because the evidence shows that either Mark cruelly beat Michael or he did not hit him at all, no instruction on this lesser included offense is needed.

This still leaves for our consideration the defense's suggestion of involuntary manslaughter based on endangering a child. K.S.A. 21-3608 provides:

"(1)  Endangering a child is willfully:
    "(a) Causing or permitting a child under the age of eighteen (18) years to suffer unjustifiable physical pain or mental distress; or
    "(b) Unreasonably causing or permitting a child under the age of eighteen (18) years to be placed in a situation in which its life, body or health may be injured or endangered.

    . . . .

"(2)  Endangering a child is a class A misdemeanor."

Subsection (1)(a) was held unconstitutionally vague in *State v. Meinert*, 225 Kan. 816, 594 P.2d 232 (1979).

The defense's only argument for suggesting involuntary manslaughter based on endangering a child is that Mark did not look at Michael to see if he was hurt after Debbie allegedly told him that she had slipped and hit Michael's head on a doorknob, thereby placing him in a situation in which his life was endangered. It is doubtful whether this even meets the definition of endangering a child, which contains the requirement that it be willful. At best, this action could be negligent. Even then, the testimony shows that Michael was acting normally prior to Debbie going to the kitchen and Mark allegedly dropping him. No reasonable jury could convict on this potential lesser included offense based on defendant's theory of why endangering a child would be applicable.

By a motion for a new trial, the defense argued that the terms contained in K.S.A. 21-3609 "cruelly beating, and inflicting cruel and inhuman corporal punishment" are unconstitutionally vague. The trial court held they are not vague.

In determining whether a statute is constitutional, the constitutionality of the statute is presumed and all doubts must be resolved in favor of its validity. *State v. Huffman*, 228 Kan. 186, Syl. ¶ 1, 612 P.2d 630 (1980). Before the statute may be stricken down, it must clearly appear the statute violates the constitution. *Huffman*, 228 Kan. 186, Syl. ¶ 1. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *Huffman*, 228 Kan. 186, Syl. ¶ 1.

This court considered whether the predecessor to K.S.A. 21-3609 was vague in *State v. Fahy*, 201 Kan. 366, 440 P.2d 566 (1968). The statute provided:

"Any person who shall torture, cruelly beat or abuse any child under the age of sixteen (16) years or who shall willfully inflict upon such child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition shall be deemed guilty of a felony and upon conviction shall be subject to punishment by imprisonment for a term not exceeding two (2) years." K.S.A. 1967 Supp. 38-714.

This court held:

"The fact that the trial court sees fit to define the language used in a statute by governing case law or common dictionary meaning does not indicate indefiniteness. It is only required that the phrase used provides reasonable definite standards which one reading the statute can understand and contemplate. [Citation omitted.] We hold that words like 'beat,' 'abuse,' 'torture,' 'cruelty' and 'traumatic' provide such standards." *Fahy*, 201 Kan. at 370.

We see no reason to hold that *Fahy* was incorrectly decided. Hupp argues that the result reached in *State v. Meinert*, 225 Kan. 816, supports our overruling *State v. Fahy*. In *State v. Meinert*, a majority of this court held the phrase "unjustifiable physical pain," 225 Kan. at 819, to be unconstitutionally vague because it could cover anything from a minor spanking or slapping to a severe beating, depending upon the personal beliefs of the individual hearing the case. We have no such problem concerning K.S.A. 21-3609 as the words used in it are more definite.

Affirmed.