No. 77,097

STATE OF KANSAS, *Appellee,* v. AARON SMALLWOOD, *Appellant.*

(955 P.2d 1209)

Opinion filed March 6, 1998.

*Thomas Jacquinot*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Stephen D. Maxwell*, assistant attorney general, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals his convictions for felony murder, K.S.A. 21-3401, and for two counts of child abuse, K.S.A. 21-3609, claiming the trial court (1) violated his statutory and constitutional rights to speedy trial; (2) erroneously admitted testimony from the pathologist and gruesome autopsy photographs; (3) erroneously failed to give lesser included offense instructions; and

(4) violated his rights under *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). Defendant also claims there was insufficient evidence to support his convictions and that his convictions for child abuse felony murder and child abuse violate the prohibition against double jeopardy.

Kaine M. Smallwood, the son of Aaron and Amber Smallwood, was born on July 22, 1993 in Coffeyville, Kansas. On August 23, 1993, Kaine was admitted to a local hospital because he had stopped breathing. A chest x-ray revealed a fractured collarbone. Kaine was transported to a Wichita hospital and admitted to intensive care. A CAT scan revealed a hemorrhage between Kaine's skull and brain and two fractured ribs. One of Kaine's physicians stated that the brain injury had occurred immediately before Kaine stopped breathing. A report was referred to a child protection team for evaluation of possible child abuse. The report was referred to SRS, but never investigated.

On September 7, 1993, Kaine was again taken to the Coffeyville hospital emergency room, then flown by helicopter to Wichita. Examination revealed an inability to breathe, external bruises on his left ear and left temple, and a hemorrhage outside the brain, an injury considered consistent with child abuse. The treating physician believed that Kaine's inability to breathe had been immediately preceded by external trauma. Kaine never recovered from this injury and died on November 4, 1993, at the age of 3½ months.

Aaron testified at trial that he had placed Kaine on a couch while he went to the bathroom to get a washcloth and heard Kaine fall off the couch. When he went to pick up Kaine, the baby was not breathing. Additional facts will be stated as necessary for determination of the issues.

## PROCEDURAL HISTORY

### A. Case 93-CR-288 C

On December 6, 1993, Smallwood was charged with one count of second-degree murder, K.S.A. 21-3402(b), in Case 93-CR-288 C. Smallwood waived preliminary hearing, was arraigned, and pled not guilty on January 14, 1994. At that arraignment, the following colloquy occurred.

"COURT: Mr. Smallwood entered a plea of guilty and we need to set this within 180 days, and it's going to take three days. Sometime in July.

"MRS. EVERITT [Prosecutor]: Only got until July 15.

"MR. EASTMAN [Defense counsel]: We'd waive time to fit in with the court docket. Be July 10 or something, but we'd waive time.

"COURT: You understand we are required, Mr. Smallwood, to bring you to trial within 180 days after you're arraigned; and if we don't do that, then you can't be charged for anything. It's my understanding you're giving up that 180-day time at this time *and going to agree to whatever date we set it?*

"MR. EASTMAN: Yes, sir.

"COURT: Okay. Let's do it what time, August 1?

"MRS. EVERITT: Well, what do you want?

"MR. EASTMAN: That's fine.

"COURT: You're probably going on vacation too, Mr. Smallwood.

"DEFENDANT SMALLWOOD: No, I got no plans for vacation.

"MR. EASTMAN: August, I think, would be fine.

"COURT: August 1.

"MR. KRITZ: That's fine.

"COURT: Because you got a two-week trial in July, so I mean that shoots July. Okay. First day of August, 1994, *and the defendant has waived the 180-day speedy trial provision.*

"MR. EASTMAN: Yes, sir. We will do it in writing if you want us to.

"COURT: Please do that. Your bond will continue. You stay in touch with Mr. Eastman, and we will see you in August, if not sooner, okay?

"DEFENDANT SMALLWOOD: Okay." (Emphasis added.)

The district judge set trial for August 1, 1994. On July 26, 1994, the judge granted Smallwood's motion to continue trial to December 5, 1994. (It appears from the record that both attorneys agreed to the extension of trial date and agreed that the delay would be charged to the defendant.) The case was set for trial as case # 2 for December 5, 1994. On December 5, 1994, case # 1 went to trial. Neither party in the *Smallwood* case appeared, and the case was continued to be reset later by the district court. The court reset the case for trial as case # 2 on January 23, 1995, with a backup date of February 13, 1995. The # 1 case was tried on January 23, 1995. On February 13, 1995, neither party appeared for trial. No order for continuance was filed. The defendant did not object to the continuances or resettings of the trial date, nor did he withdraw his speedy trial waiver.

At the end of 1994, the assistant county attorney handling the case resigned. Prior to March 2, 1995, the Montgomery County Attorney, Ann Smith, requested that the state attorney general handle the case. In a March 2, 1995, letter to Patrick Peters, deputy attorney general, Ms. Smith stated that the file indicated a waiver of defendant's speedy trial rights and the case had been reset for trial May 8, 1995. On March 6, 1995, the district judge wrote a letter to all counsel, setting the trial on May 8, 1995. Defendant did not object.

By March 14, 1995, the defendant was aware that the attorney general was prosecuting the case. The attorney general believed that the case was undercharged. The prosecutor set a deadline in the second half of March for Smallwood to plead guilty to second-degree murder or be charged with first-degree child abuse felony murder.

On May 8, 1995, the defendant and his new attorney unexpectedly appeared in the courthouse. During a conversation in the hallway, the district judge was informed that they were ready for trial and Smallwood was asserting his right to speedy trial. The district judge said that he had been contacted by the State and was informed the case would not be tried on May 8. There was no record made of this conversation. The defendant neither withdrew his waiver of a speedy trial nor gave notice that he was now asserting his right to speedy trial.

### B. Case 95-CR-167 I

On May 9, 1995, based on the same facts, the State filed a second case, 95 CR-167, against Smallwood charging three counts: felony child abuse murder, K.S.A. 21-3436, resulting from alleged child abuse on September 7, 1993 (Count I); child abuse, K.S.A. 21-3609, occurring on September 7, 1993 (Count II); and child abuse occurring on August 23, 1993 (Count III). Smallwood was arraigned on the new charges on July 20, 1995. On November 9, 1995, Smallwood's motion to dismiss the original case on various grounds, including violation of his right to speedy trial, was denied. The State dismissed the original case (93-CR-288 C) on November 27, 1995. After May 9, 1995, Smallwood requested two continu-

ances of trial, which were granted. Trial commenced on March 22, 1996. Smallwood was convicted of first-degree felony child abuse murder and two counts of child abuse and sentenced to life in prison plus 68 months.

Smallwood claims violations of both his statutory and constitutional rights to speedy trial. He further claims there was preindictment delay and prosecutorial vindictiveness.

## I. SPEEDY TRIAL

### A. Statutory Violation

K.S.A. 22-3402(2) provides:

"If any person charged with a crime and held to answer on an appearance bond shall not be brought to trial within one hundred eighty (180) days after arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant . . . ."

An accused may waive his or her statutory right to a speedy trial by requesting, or acquiescing in, the grant of a continuance. *State v. Bean*, 236 Kan. 389, 392, 691 P.2d 30 (1984); see *State v. Bafford*, 255 Kan. 888, 892, 879 P.2d 613 (1994); *State v. Brown*, 249 Kan. 698, 704, 823 P.2d 190 (1991). Any additional period of time assessed against a defendant due to the necessity of rescheduling a trial because of a defendant's fault should be limited to a reasonable time measured by the particular circumstances of the case. *State v. Dreher*, 239 Kan. 259, 261, 717 P.2d 1053 (1986); *State v. Bean*, 236 Kan. at 393; *State v. Sherman*, 217 Kan. 326, 330, 536 P.2d 1373 (1975).

Smallwood argues that his statutory right to a speedy trial within 180 days of arraignment was violated. He asserts that when he waived his right to a speedy trial on January 14, 1994, his waiver of the right to a speedy trial only applied to the 180-day period from July 14, 1994, to August 1, 1994. However, the record does not support this claim.

The record reflects that Smallwood's speedy trial claim has no merit. At his arraignment for second-degree murder in 93-CR-288 C on January 14, 1994, Smallwood unconditionally waived his right to speedy trial.

In 95 CR-167, Smallwood was arraigned for first-degree felony murder and two counts of abuse of a child on July 20, 1995, and the trial was set for December 11, 1995, 144 days after arraignment. After the trial date was set, Smallwood requested and was granted a continuance of the trial to March 22, 1996. In computing the time between arraignment and trial, those delays which are caused by the application or fault of the accused are not to be counted. These additional 101 days are chargeable to Smallwood. He was convicted after a 4-day trial on March 28, 1996, within the statutory period.

Smallwood also argues that the State subsequently filed the more serious charges against him in 95 CR-167 to avoid the running of the speedy trial deadline in 93 CR 288. He asserts that under these circumstances, the time of the two cases should be tacked together. Smallwood points out that absent a showing of necessity, the State cannot dismiss a criminal action and then refile the identical charges against a defendant to avoid the time limitations mandated by statute. *State v. Cuezze, Houston & Faltico*, 225 Kan. 274, 278, 589 P.2d 626 (1979). Here, the assertion fails because the State did not file the identical charges in the second case to avoid the time limitation imposed by the statute; it charged more serious crimes in the second complaint.

## B. Constitutional Violation

Smallwood next argues that his constitutional right to a speedy trial was violated. In *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), the United States Supreme Court adopted a four-factor case-by-case approach for determining whether a defendant has been deprived of his or her constitutional right to a speedy trial. The factors are: length of delay, reason for the delay, the defendant's assertion of his or her right, and prejudice to the defendant. 407 U.S. at 530. We adopted this balancing test in *State v. Otero*, 210 Kan. 530, 502 P.2d 763 (1972), and later noted that if the length of delay was not presumptively prejudicial, the other factors of the test need not be considered. *State v. Goss*, 245 Kan. 189, 193, 777 P.2d 781 (1989). In *State v. Fitch*, 249 Kan. 562, 564, 819 P.2d 1225 (1991), the court observed that *Barker*

mandates an ad hoc approach in which each case is analyzed according to its particular circumstances. The *Fitch* court then reviewed a variety of speedy trial cases and explained that, under the facts, lengths of delay from 1 to 5 years had not violated the defendant's right to a speedy trial.

Three factors which may demonstrate the defendant has been prejudiced by a delay of trial are oppressive pretrial incarceration; anxiety and concern of the accused; and, most important, impairment of the defense. *State v. Vaughn*, 254 Kan. 191, 196, 865 P.2d 207 (1993).

Here, the length of delay between arraignment and trial was 26 months. During that time, the defendant requested two continuances and agreed to another one totalling 15 months. In addition, he filed nine pretrial motions in a 5-month period not covered by the continuances. The primary reason for delay of trial was the application of the defendant for the continuances and the numerous motions filed between May 9, 1995, and December 1995, when he requested and was granted a continuance to March 1996. Applying the factors set out in *Vaughn*, Smallwood was never incarcerated and failed to demonstrate any prejudice to his trial defense due to the delay. For these reasons, Smallwood's Sixth Amendment speedy trial rights were not violated.

## C. Preindictment Delay and Prosecutorial Vindictiveness

Smallwood's claims of preindictment delay and prosecutorial vindictiveness have little merit.

The United States Supreme Court has held that the speedy trial clause of the Sixth Amendment is inapplicable to preindictment delay. *United States v. Marion*, 404 U.S. 307, 320, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971). This court has reached the same conclusion in interpreting § 10 of the Bill of Rights of the Kansas Constitution. *State v. Trotter*, 203 Kan. 31, 453 P.2d 93 (1969). Therefore, if Smallwood is to prevail he must demonstrate a violation of due process.

This issue is governed by *United States v. Lovasco*, 431 U.S. 783, 52 L. Ed. 2d 752, 97 S. Ct. 2044 (1977), cited by defendant. In *Lovasco*, an indictment was returned some 18 months after the

offense was allegedly committed. The defense attempted to establish prejudice by showing the delay caused the loss of two defense witnesses. According to the government, the delay resulted from an attempt to uncover additional perpetrators. The lower federal courts concluded that the delay was unjustified, unnecessary, and unreasonable and that the Due Process Clause barred prosecution.

The Supreme Court reversed, holding "that to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." 431 U.S. at 796. A showing of prejudice, while necessary to support a due process claim, is not sufficient in itself. Rather, a "due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." 431 U.S. at 790. The Court indicated that governmental delay solely " 'to gain tactical advantage over the accused' " would violate due process. 431 U.S. at 795 (quoting *Marion*, 404 U.S. at 324). In *State v. Royal*, 217 Kan. 197, 202, 535 P.2d 413 (1975), we reached the same conclusion, stating:

"[T]wo questions must be considered in testing whether there has been an impermissible encroachment on due process rights: (1) Has the delay prejudiced the accused in his ability to defend himself, and (2) was the delay a tactical device to gain advantage over him? Affirmative answers to both questions need be supplied before it may be said that criminal charges should be dismissed."

For Smallwood to prevail on this claim, he must show not only that he was prejudiced by a delay, but also that the delay was due solely to an attempt by the State to gain a tactical advantage over him. This he has not done.

With respect to Smallwood's claim of prosecutorial vindictiveness, in *Bordenkircher v. Hayes*, 434 U.S. 357, 54 L. Ed. 2d 604, 98 S. Ct. 663 (1978), the United States Supreme Court faced a similar claim. After Hayes refused to plead guilty to a felony indictment for uttering a forged instrument, the state prosecutor reindicted the defendant, charging him under the habitual criminal statute and thereby subjecting him to a greater penalty. Hayes was convicted and received the greater penalty. After the state appellate courts affirmed the sentence, the defendant filed a writ of habeas corpus in the federal district court. It was denied. On ap-

peal, the federal Court of Appeals found prosecutorial vindictiveness had occurred and reversed.

After granting *certiorari*, the Supreme Court, in reversing the Court of Appeals, found that the defendant's due process rights were not violated when the prosecutor carried out the threat to reindict the defendant on more serious charges. The Court found it immaterial that the prosecutor was in possession of the evidence justifying the more serious charge at the time of the original indictment and that the defendant's refusal to plead guilty was what led to his second indictment. The prosecutor's conduct did no more than openly present the defendant with the alternative of foregoing trial or facing charges on which he was plainly subject to prosecution. It concluded that there is no violation of due process rights where the State prosecutor, during plea negotiations, threatened to reindict the defendant on more serious charges if he did not plead guilty. 434 U.S. at 365. See *United States v. Frederick*, 551 F. Supp. 1035 (D. Kan. 1982).

Similarly, here, the prosecutor informed Smallwood that he would reindict him on a more serious charge (felony murder) if he refused to plead guilty to second-degree murder. As in *Bordenkircher*, this charge was one for which Smallwood was plainly subject to prosecution. Therefore, Smallwood's claim of prosecutorial vindictiveness fails.

## II. EXPERT WITNESS

Smallwood next argues that the trial court erred in allowing Dr. Jill Gould, a forensic pathologist who performed the autopsy on the child, to state conclusively that Kaine had died from child abuse and to testify as to her experience of "standard excuses" used by child abusers. Smallwood claims that this testimony improperly focused on Dr. Gould's personal opinion of Smallwood's credibility and violated his right to a fair trial.

As a prerequisite for the testimony of a witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training, or education if such be required. Such evidence may be by the testimony of the witnesses themselves. The judge may reject the witness' testimony that the

witness perceived a matter if the judge finds that no trier of fact could reasonably believe that the witness did perceive the matter. The judge may conditionally receive the testimony of the witness as to a relevant or material matter, subject to the evidence of knowledge, experience, training, or education being later supplied in the course of the trial. K.S.A. 60-419.

Specifically, Dr. Gould testified that she found evidence of an old fracture of the clavicle, old fractures of two ribs, subacute pneumonia, an old subdural hematoma or a collection of blood between Kaine's skull and the brain, and evidence of a subsequent subdural hematoma or swelling in the brain. In her opinion, Kaine died of head injuries which caused the subsequent subdural hematoma and brain swelling.

The following colloquy then occurred:

"Q. . . . [W]as there any explanation given for the injuries to this child that would account for the subdural hematoma?

"A. For the first subdural hematoma, I was not given any kind of explanation. For the second subdural hematoma, it was my understanding that the baby had, um, perhaps rolled off a couch.

"Q. Would a baby rolling off a couch cause the kind of injuries that you discovered in your autopsy?

"A. One has to take into consideration the variables, how far up from the floor the seat of the couch is, and what kind of a surface the baby is rolling on to, but generally the studies have shown that the children who have fallen from couches have not sustained life-threatening diseases—life-threatening processes. In other words, the distance from the couch to the floor, generally, is not enough distance to cause these kind of injuries.

"Q. And if a child rolled from the couch to the floor, rolled on the couch and fell on to a carpeted floor, would that even make it more unlikely that the injuries had occurred by that way?

"A. Yes.

"Q. And—just a moment, please. Can the subdural hematoma come about through something like an automobile accident?

"A. Yes.

. . . .

"Q. . . . [B]ased upon your . . . examination here . . . would you say that this child died from child abuse?

"A. Yes.

"Q. In your experience, Doctor, is there a standard excuse for what happened to a child that is given by . . . someone who . . . takes a child to the hospital? Is there a standard excuse or explanation of the child's injuries?

"Q. Objection. . . .

. . . .

"A. . . . [W]e hear stories that the child did roll off the couch is a common one. Another one is, is the child fell and hit their head on the coffee table, or another one is we don't know what happened. The child just was—I went to check them while they were taking a nap and they didn't wake up, so those are the main three . . . stories, that we hear."

General rules for admission of expert testimony are well established. The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. See *State v. Cheeks*, 253 Kan. 93, 99, 853 P.2d 655 (1993); *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991).

The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Where the normal experience and qualifications of laypersons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *State v. Hodges*, 239 Kan. 63, 67, 716 P.2d 563 (1986). An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. An expert witness may not pass on the weight or credibility of evidence. *State v. Colwell*, 246 Kan. 382, 389, 790 P.2d 430 (1990).

No error in either the admission or the exclusion of evidence by the court is a ground for granting a new trial or for setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. K.S.A. 60-261; *State v. Morris*, 255 Kan. 964, Syl. ¶ 6, 880 P.2d 1244 (1994).

An appellate court's review of the trial court's admission of evidence is a two-step process. First, it must determine whether the

evidence was admissible or inadmissible. Then, if the evidence was improperly admitted, it must determine whether to apply the harmless error rule of review or the federal constitutional error rule to the erroneous admission of that evidence.

Under the federal constitutional error rule, an error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Before we may declare the error harmless, we must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McClanahan*, 259 Kan. 86, Syl. ¶ 4, 910 P.2d 193 (1996).

With respect to the testimony that Kaine died as a result of child abuse, Smallwood claims that this testimony invaded the province of the jury. Smallwood's argument on this point has little merit. This is not a case such as *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985),where the court upheld the trial court's determination that it was improper for a board certified psychologist, who qualified as an expert witness, to testify that in his opinion the alleged victim had been sexually molested by the defendant, his father. In *Lash*, the defendant testified and denied any acts constituting indecent liberties with his son. The court determined that when the prosecutor asked the psychologist to give his expert opinion as to whether the alleged victim had been sexually molested by his father, the prosecutor, in effect, was asking the expert for his opinion as to whether the son was telling the truth that his father was his molester. That question clearly was improper, since such an expression of opinion requires the expert to pass upon the credibility of witnesses or the weight of disputed evidence. 237 Kan. at 386. Here, however, by stating that, based upon her medical experience, Kaine died as a result of child abuse, either shaking or a blow to the skull, Dr. Gould was not testifying as to the ultimate question of Smallwood's guilt or innocence. Expert testimony in the form of an opinion is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact. K.S.A. 60-456(d).

Dr. Gould's testimony that, in her experience, falling off a couch is one of the standard excuses given by someone bringing an in-

jured child to the hospital was admitted over defendant's objection. In addition, in closing argument, the prosecutor emphasized that testimony, stating:

"You might remember a little bit more of Dr. Gould's testimony. I said is there a standard thing you hear is cases of child abuse? Is there a standard excuse? She said the one we hear most often is that the child fell off a couch and hit the floor. That was the first one you heard in this case."

This testimony is similar in character to testimony disapproved in *State v. Clements*, 244 Kan. 411, 770 P.2d 447 (1989). In *Clements*, the defendant appealed his conviction for aggravated criminal sodomy. Clements claimed that the trial court improperly allowed the State's expert witness to testify at length about the treatability and psychology of typical sexual offenders. While the psychologist, in describing the typical psychology of an adult who sexually abuses children, did not state that these characteristics related to the defendant, over defendant's objection, the prosecutor was allowed to tie this testimony to Clements in closing argument. The *Clements* court determined that this type of evidence was improper because a description of the characteristics of a typical offender had no relevance to whether the defendant committed the crime in question, and the only inference which could be drawn from such evidence was an impermissible one, namely, that a defendant who matches the profile must be guilty. 244 Kan. at 420.

Here, Smallwood denied ever hurting Kaine in any manner, and his version of Kaine's injuries was that they were an "unexplained mystery." Under the circumstances, because Smallwood did not rely upon the fall from the couch as an explanation for Kaine's September injuries, the admission of Dr. Gould's statement, although improper expert testimony, was harmless beyond a reasonable doubt.

## III. GRUESOME PHOTOGRAPHS

Smallwood argues that several of the photographs introduced at trial were unduly prejudicial and fundamentally unfair because they were gruesome and inflammatory and their prejudice outweighed their probative value. Smallwood argues that since he tes-

tified that Kaine's injuries were an "unexplained mystery" and the circumstantial evidence indicated that Kaine received traumatic injuries while in Smallwood's care, the cause of death was not an issue and the photographs were not probative but merely prejudicial. The State counters that even when the defendant stipulates to the cause of death, the prosecution bears the burden of proving all the elements of the crime charged.

The admission of photographs in a homicide case is a matter within the trial court's discretion, and the court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Reed*, 256 Kan. 547, 557, 886 P.2d 854 (1994) (citing *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 [1993]). We have held that special care should be taken in admitting photographs taken at an autopsy in order that the evidence not be more gruesome than necessary. See *State v. Prouse*, 244 Kan. 292, Syl. ¶ 1, 767 P.2d 1308 (1989). In a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome. *State v. Sutton*, 256 Kan. 913, Syl. ¶ 3, 889 P.2d 755 (1995).

The alleged gruesome photographs were: Exhibit 8 was a view of the skull after the brain was removed showing the floor of the skull. The pathologist, Dr. Gould, used the photograph to illustrate an area of bleeding around the left eyeball and testified that this indicated there was inside bleeding and that the pressure became so great that the blood pushed forward and collected around the back of the eye. Exhibit 10 showed the top of the skull after it was removed, indicating a collection of dark blood and yellow staining indicative of old blood that had been there for some time. Dr. Gould used the photograph to substantiate her report that the autopsy revealed both a new and old injury to the brain. She stated that the old injury was 3-4 weeks to months old.

Exhibits 11, 12, and 13 were also used by the pathologist, who testified that a subdural hematoma can be caused by shaking or by a blunt force trauma, or by "shearing" forces. She noted that if no bruises are found after examining the skull for bruises, one can

determine that the acceleration/deacceleration forces are produced by shaking.

Except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f). Even where the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a first-degree murder case. Photographs are unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, and add nothing to the State's case. *State v. Hickles*, 261 Kan. 74, 85, 929 P.2d 141 (1996).

Although the autopsy photographs were not particularly pleasant, they were relevant to the pathologist's testimony as to the cause of death and were true reproductions of relevant physical facts and material conditions at the scene at issue. See *State v. Reed*, 256 Kan. at 557. By their very existence, exhibits in a murder trial such as this are inevitably gruesome and unsettling. See *State v. Kingsley*, 252 Kan. 761, 770, 851 P.2d 370 (1993). Here, the autopsy photographs admitted were not cumulative and had a legitimate purpose for their introduction. After a careful examination of the photographs, we find none are particularly gruesome or unduly prejudicial; therefore, their admission into evidence was not error.

## IV. INSTRUCTIONS

Next, Smallwood argues that the trial court erred in failing to instruct on involuntary manslaughter as a lesser included offense of first-degree felony murder and misdemeanor battery as a lesser crime included within the offense of child abuse. First-degree felony murder is committed in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436. K.S.A. 21-3401(b). Involuntary manslaughter is the unintentional killing of a human being committed in the commission of, or attempt to commit, or flight from any felony other than an

inherently dangerous felony defined in K.S.A. 21-3436, that is enacted for the protection of human life or safety or a misdemeanor that is enacted for the protection of human life or safety, including acts described in K.S.A. 8-1566, 8-1567, and 8-1568. K.S.A. 21-3404(b). Misdemeanor battery is (a) intentionally or recklessly causing bodily harm to another person; or (b) intentionally causing physical contact with another person when done in a rude, insulting, or angry manner. K.S.A. 21-3412. Child abuse is intentionally torturing, cruelly beating, shaking which results in great bodily harm, or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years. K.S.A. 21-3609.

The test to determine if an instruction on a lesser included offense is required is whether there is any substantial evidence tending to prove that lesser included offense. *State v. Armstrong*, 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987). The analysis of whether the jury should have been instructed on a lesser included offense of the underlying felony is a two-step analysis. The first step is to determine whether the evidence of child abuse was so strong that no instruction on lesser included offenses was necessary. If the evidence was not strong, this court would consider whether there was substantial evidence on which a jury could have found the defendant guilty of the lesser included offenses. If there was not, no instruction on lesser included offenses need have been given. *State v. Hupp*, 248 Kan. 644, 652, 809 P.2d 1207 (1991).

The evidence shows that Amber Smallwood left a healthy baby in the care of Aaron Smallwood. After Kaine was admitted to the hospital, it was determined he had injuries to his skull that proved to be fatal. Physicians who examined Kaine and the physician who performed the autopsy testified that Kaine's head injuries were consistent with a severe shaking or beating. The pathologist testified that she found evidence of an old subdural hematoma or a collection of blood between Kaine's skull and the brain, evidence of edema or swelling in the brain, evidence of an old fracture of the clavicle, old fractures of two ribs, and subacute pneumonia. In her opinion, Kaine died of head injuries consisting of a subdural hematoma and brain swelling resulting from a severe beating or shaking. Dr. James Christensen, the Smallwoods' family doctor,

testified that based upon the history and the findings of Wesley Medical Center, it was his feeling that the parents' story did not relate directly to what he had observed in Kaine. He did not make a statement of child abuse at that time, but had questions regarding what he was told and saw. He stated there was bleeding in Kaine's skull before September 7 and that he had not heard an explanation of what would have caused Kaine's injuries.

Dr. Curtis Pickert, medical director of the pediatric ICU at Wesley Medical Center, treated Kaine on both occasions after he was flown to Wichita. He testified that on August 24, 1993, an x-ray revealed that Kaine had sustained a fractured clavicle, a rib fracture, and a reddish colored bruise over the area of the right clavicle, which indicated a recent injury within 2-3 days. Dr. Pickert also testified that Kaine suffered from a subarachnoid hemorrhage, which was caused by a forceful blow. (He then stated he referred the case to the hospital's child protection team to investigate the possibility of child abuse.) At his second visit (September) to Dr. Pickert, Kaine exhibited bruising around the head. Kaine's brain was so swollen that his fontenal separated. Dr. Pickert also testified that the color indicated relatively new blood, and the x-rays indicating fractures showed that some injury occurred 10-14 days prior to September 7, 1993. He stated that when he examined Kaine on September 8, 1993, it appeared that Kaine had received a blow and that trauma induced to the side of Kaine's head was significant enough to create bruising in three different areas. He testified that it would have been difficult for one single blow to create all three of the bruises and suggested that there were multiple forces applied. He also testified that on September 8, 1993, the multiple areas of bleeding and hemorrhage would not typically result from a fall from a couch to the carpeted floor and that the bruising within Kaine's ear was inconsistent with a fall from a couch. Finally, Pickert stated that whatever happened to make Kaine stop breathing had happened within seconds to minutes prior to the stoppage of breathing. It was undisputed that Aaron was the only person with Kaine at the time of the incident.

Dr. Christensen testified that with respect to the September 7 incident, it was his feeling that the parents' story did not relate

directly to what he observed in Kaine and, although he did not make a statement of child abuse at that time, he had questions regarding what he was told and what he saw. He also stated there was bleeding in Kaine's skull before September 7 and testified that this was an "abnormal occurrence." Because he had heard no plausible explanation for the injury, Dr. Christensen testified it could only be explained by child abuse.

Smallwood testified that he did not strike or shake Kaine at any time. This evidence presented the jury with two choices: Either Aaron hit or shook Kaine with such force as to injure his brain and kill him, or there was some kind of accident. In battery, the only requirement is that a defendant intentionally touch or apply force and that it be done in a rude, insolent, or angry manner. Under these circumstances, the trial court was correct in holding that the evidence of the underlying felony of child abuse was strong rather than weak, and no lesser included instruction on involuntary manslaughter was required.

## V. BATSON

Smallwood alleged the State's peremptory challenges that struck the only two minority males (the two jurors and Smallwood are African-American) from the venire were racially motivated, violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). The State articulated its reasons for striking the jurors, and the trial court found that the explanations were race-neutral.

On appeal, Smallwood challenges only one of the two strikes. The State explained that its strike was based upon a conversation which occurred on the way to the courthouse, when one of the jurors engaged the prosecutor in a brief conversation on the way into the courtroom about a Kansas University basketball game. The prosecutor stated that after defense counsel stated in voir dire that it was improper for attorneys to engage in conversation with potential jurors, he became concerned the juror might think he (the attorney) had done something wrong. Based upon this explanation,

the trial court found that the State had not systematically discriminated in exercising the peremptory challenge.

In reviewing a *Batson* violation concerning the State's use of a peremptory challenge, the applicable appellate standard of review is whether the trial court abused its discretion in determining if the challenged strikes were constitutionally permissible. See *State v. Walston*, 256 Kan. 372, 373-74, 886 P.2d 349 (1994). Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner, or in other words, when no reasonable person would take the view adopted by the trial court. *Walston*, 256 Kan. at 374 (citing *State v. Wagner*, 248 Kan. 240, 242, 807 P.2d 139 [1991]).

The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination. 476 U.S. at 96-98.

A review of the record does not indicate the State purposefully attempted to strike African-Americans from the jury. Applying the deferential *Batson* standard to this case, the reasons proffered by the State do not relate to characteristics of any particular race. Under the circumstances, the trial court did not abuse its discretion in determining the State's justification for use of its peremptory challenge to be racially neutral.

## VI. SUFFICIENCY OF THE EVIDENCE

Smallwood's claim seems to be that the evidence that convicted him was primarily circumstantial and therefore was insufficient evidence to convict him. The standard of review on sufficiency of the evidence is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Bradford*, 254 Kan. 133, Syl. ¶ 3, 864 P.2d 680 (1993). The appellate court looks only to the evidence in

favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994).

A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Hupp*, 248 Kan. at 652 (quoting *State v. Graham,* 247 Kan. 388, 398, 799 P.2d 1003 [1990]). The fact that the evidence was circumstantial is not determinative, as a conviction based on circumstantial evidence is permissible. Based upon the testimony of the three physicians, the evidence at trial was sufficient to convict Smallwood of child abuse felony murder and abuse of a child.

## VII. DOUBLE JEOPARDY

Felony murder in Kansas is defined as "killing of a human being committed: (b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436." K.S.A. 21-3401(b). Here, a child abuse charge served as the underlying felony for felony murder. Smallwood contends that convictions for both first-degree child abuse felony murder and child abuse based upon the same act (the September 7 incident) violate the constitutional prohibition against double jeopardy and the doctrine of multiplicity. Smallwood first raised this issue in a pretrial motion to dismiss, arguing that the offense of child abuse merged with the charge of felony murder.

Smallwood acknowledges that it is the well-established law in Kansas that multiple convictions and punishments for both felony murder and certain underlying felonies have been determined not to be violations of double jeopardy. See, *e.g., State v. Kaiser*, 260 Kan. 235, Syl. ¶ 7, 918 P.2d 629 (1996) (aggravated kidnapping and aggravated robbery); *State v. Johnson*, 258 Kan. 475, 905 P.2d 94 (1995) (aggravated kidnapping and aggravated robbery); *State v. Butler*, 257 Kan. 1043, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996) (aggravated robbery); *State v. Swafford*, 257 Kan. 1023, 897 P.2d 1027 (1995), *modified on other grounds* 257 Kan. 1099, 913 P.2d 196 (1996) (aggravated robbery); *State v. Sutton*, 256 Kan. 913, 889 P.2d 755 (1995) (aggravated kidnapping and aggravated robbery); *State v. Bailey*, 247

Kan. 330, 340, 799 P.2d 977 (1990), *cert. denied* 500 U.S. 920 (1991) (aggravated robbery); *State v. Pioletti*, 246 Kan. 49, 785 P.2d 963 (1990) (aggravated kidnapping); *State v. Gonzales*, 245 Kan. 691, 702-04, 783 P.2d 1239 (1989) (attempted rape); *State v. Dunn*, 243 Kan. at 433 (aggravated kidnapping and aggravated robbery). Smallwood argues that although the Kansas Legislature has statutorily provided for conviction and punishment for both felony murder and the underlying felony, he claims that the imposition of consecutive sentences for his convictions of first-degree felony murder and child abuse violates the United States Constitution prohibition against double jeopardy.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall be subject to be twice put in jeopardy of life or limb for the same offense. The Clause is enforceable against the states via the Fourteenth Amendment. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969). Section 10 of the Kansas Constitution Bill of Rights provides similar double jeopardy protection. See *State v. Cady*, 254 Kan. 393, 396-97, 867 P.2d 270 (1994). The Double Jeopardy Clause shields persons from "(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense." 254 Kan. at 396. At issue here is the third protection, that against multiple punishments for the same offense.

The appropriate test to apply a double jeopardy claim is found in *State v. Dunn*, 243 Kan. at 432, where the court stated:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is whether each statutory provision requires proof of an element that the other does not. Where one statute [requires] proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap."

A violation of the prohibition against double jeopardy is a question of law, and this court's review is de novo.

Distinguishing felony murder from child abuse that results in death has had a tumultuous history in Kansas. In *State v. Lucas,* 243 Kan. 462, 759 P.2d 90 (1988), *aff'd on rehearing* 244 Kan. 193, 767 P.2d 1308 (1989), the defendant appealed his convictions of two counts of child abuse, one count as to Shannon W. and one count as to Shaina W., and one count of felony murder with a separate count of child abuse as to Shaina, who had died as a result of the abuse. On appeal Lucas contended that the district court erred in failing to dismiss the charge of felony murder because the child abuse charge as to the child who died merged into the felony murder and could not constitute the requisite collateral felony to support the felony-murder charge. The *Lucas* court first reviewed K.S.A. 21-3401 (Ensley 1988), which stated:

> "Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation *or committed in the perpetration or attempt to perpetrate any felony.*" (Emphasis supplied.)

It noted that in *State v. Lashley,* 233 Kan. 620, 664 P.2d 1358 (1983), the court observed that a literal reading in this statute would find any felony to be sufficient to support a charge of felony murder if a causal relationship exists between the felony and the death. However, to do so would violate double jeopardy. The *Lashley* court concluded that the purpose of the statute is to deter those engaged in felonies from killing negligently or accidentally, and the doctrine should not be extended beyond its rational function. 233 Kan. at 631.

In order to apply the felony-murder doctrine: (1) the underlying felony must be one which is inherently dangerous to human life; and (2) the elements of the underlying felony must be so distinct from the homicide so as not to be an ingredient of the homicide. In determining whether an underlying felony is inherently dangerous to human life so as to justify a charge of felony murder, the elements of the underlying felony should be viewed in the abstract, and the circumstances of the commission of the felony should not be considered in making the determination. *Lucas,* 243 Kan. at 465-66.

Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. *State v. Shaw*, 260 Kan. 396, Syl. ¶ 1, 921 P.2d 779 (1996). A single assaultive incident of abuse of a child (K.S.A. 21-3609) which results in the death of the child merges with killing and constitutes only one offense. The coupling together of prior acts of abuse of a child with the lethal act of abuse into one collective charge of abuse of a child does not prevent the operation of the merger rule. Language to the contrary found in *State v. Brown*, 236 Kan. 800, 696 P.2d 954 (1985), was disapproved. *Lucas*, 243 Kan. 462, Syl. ¶ 5.

Just as the underlying felony of child abuse may merge into the murder, the felony may also be too distant in time from the murder to permit a felony-murder charge. We concluded that under the existing statutes, when a child dies from an act of assaultive conduct, evidence of prior acts of abuse cannot be used to escalate the charge into felony murder. Such acts could be separate acts of abuse of a child but the prosecutorial device of charging abuse of a child in one count cannot bootstrap into a felony-murder charge.

Abuse of a child as a separate felony supporting felony murder is not the only time felony murder has run into merger and double jeopardy problems in Kansas. In *State v. Leonard*, 248 Kan. 427, 807 P.2d 81 (1991), the State charged the defendant with one count of first-degree felony murder and multiple counts of aggravated assault. The trial court dismissed the felony-murder count, finding that felony murder could not be supported by aggravated assault as the underlying felony. The State amended the information to charge second-degree murder. A jury found Leonard guilty of involuntary manslaughter and six counts of aggravated assault. The State appealed the dismissal of the felony-murder count under K.S.A. 22-3602(b).

The *Leonard* court observed that under the felony-murder statute, the elements of aggravated assault, the underlying felony, must be so distinct from the homicide as not to be an ingredient of the homicide. Following the rationale of *Lucas*, it concluded that one act of driving a semi-truck through the crowd was the basis for

both the aggravated assault and the felony-murder charges. The one act caused the death, and under the circumstances the elements of the aggravated assault were not distinct from the homicide. 248 Kan. at 431.

Subsequent to *Leonard*, we addressed whether to apply the rule in *Lucas* to first-degree felony murder by abuse of a child in *State v. Hupp*, 248 Kan. 644, 809 P.2d 1207 (1991), where the defendant appealed his conviction of first-degree murder based upon a killing committed in the perpetration of child abuse. Citing *Lucas*, 243 Kan. 462, the *Hupp* court noted that it had been previously determined that felony murder could not be based on child abuse because of the merger rule. The *Hupp* court pointed out that in *Lucas*, the legislature had been invited by a majority of this court to adopt a felony-murder statute covering the death of a child occurring during the commission of child abuse, stating: " 'If additional protection for children is desired, the Kansas Legislature might well consider legislation which would make the death of a child occurring during the commission of the crime of abuse of a child, or aggravated battery against a child, first- or second-degree felony murder.' *State v. Lucas*, 243 Kan. at 473." *Hupp*, 248 Kan. at 651. It noted that after *Lucas* was decided, the legislature had amended the first-degree murder statute to make a killing committed in perpetration of abuse of a child first-degree felony murder. See K.S.A. 21-3436(a)(7). The *Hupp* court concluded that the legislature intended felony murder and the rules concerning lesser included offenses in felony-murder cases to apply to child abuse murder. 248 Kan. at 651.

K.S.A. 21-3401 now states murder in the first degree is the killing of a human being committed: (a) intentionally and with premeditation; or (b) in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436.

K.S.A. 21-3436 now defines an inherently dangerous felony:

"(a) Any of the following felonies shall be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto as not to be an ingredient of the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto:

. . . .
"(7) abuse of a child, as defined in K.S.A. 21-3609 and amendments thereto."

Abuse of a child is intentionally torturing, cruelly beating, shaking which results in great bodily harm, or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years. K.S.A. 21-3609.

Here, the issue is two-fold: First, is the underlying felony of abuse of a child (Count II) so distinct from the homicide as not to be an ingredient of the homicide? Second, did the legislature intend that one who causes the death of a child through abuse of the child be guilty of felony murder?

In determining the issue, time, distance, and the causal relationship between the underlying felony (abuse of a child) and the killing (first-degree felony murder) are factors to be considered in determining whether the killing is a part of the underlying felony. *Shaw*, 260 Kan. 396, Syl. ¶ 1. Smallwood's act of shaking the child is the act that caused great bodily harm and the death of the child and is the basis for both crimes. The abuse of the child is not separated in time or distinct from the death of the child. Because there was only one act, the elements of the abuse of the child are not distinct from the homicide. The abuse of the child offense merged with the offense of felony murder, and a conviction for both first-degree felony murder and abuse of a child violates the constitutional prohibition against double jeopardy.

It is also clear that the legislature's statement in K.S.A. 21-3436(a) that certain felonies shall be deemed an inherently dangerous felony whether such felony is so distinct from the homicide alleged shows that the legislature intended that anyone who causes the death of a child while committing the act of abuse of a child to be guilty of the crime of first-degree felony murder. The trial court was correct in determining that the defendant could be found guilty of first-degree felony murder and erred in not dismissing the abuse of a child charge (Count II).

Affirmed in part and reversed in part. The case is remanded for correction of the defendant's sentence.